318 So.2d 289

**M. C. HOLCOMBE, Jr.**

v.

**Joan WHITAKER.**

**SC 909.**

Supreme Court of Alabama.

July 31, 1975.

Rehearing Denied Aug. 28, 1975.

Roderick Beddow, Jr., Birmingham, for appellant.

Rives, Peterson, Pettus, Conway & Burge, Birmingham, for appellee and cross-appellant.

SHORES, Justice.

This is an appeal from a judgment which was rendered on a jury verdict in favor of the plaintiff in the amount of $35,000. The defendant filed a motion for judgment notwithstanding the verdict or a new trial. The trial court conditioned its overruling of the motion for new trial by requiring a remittitur from the plaintiff in the amount of $15,000. The remittitur was filed and the motion for new trial overruled. The defendant appealed from the original judgment and the plaintiff filed a cross-appeal, assigning as error the condition of a remittitur for the overruling of defendant's motion for new trial.

The plaintiff, Joan Whitaker, met the defendant, M. C. Holcombe, Jr., a medical doctor, in March or April, 1970. Shortly thereafter the two began seeing each other socially; and about a month later the defendant moved into the plaintiff's apartment, where they lived together for sometime. It was the plaintiff's testimony that the defendant told her he was a divorced man. Sometime after the defendant moved into the plaintiff's apartment, he invited her to accompany him to a medical convention in San Francisco. She did so, and testified that she was asked by the defendant to pose as Mrs. Holcombe at that meeting. Following the convention, the two flew to Las Vegas, Nevada, and were married there. They left Las Vegas and went to New Orleans for a "honeymoon" and fi-

nally returned to Birmingham, where they lived together as husband and wife for approximately a month. At about that time, Dr. Holcombe began seeing a woman he had been dating prior to his marriage to the plaintiff. He had previously told Miss Whitaker that he wanted to tell this woman personally about his having married. When the plaintiff objected to his resuming his relationship with this woman, he then told her that he was still married to his first wife. She then asked him to either have the marriage with her annulled or get a divorce from his first wife and marry her legally. Her testimony was that the defendant said "he wasn't going to do either one."

To say the least, the relationship between Miss Whitaker and Dr. Holcombe began to disintegrate from this point forward. He moved out of the apartment, but came back from time to time, staying for as long as a week on at least one occasion. The plaintiff continued to ask him to get an annulment or to get a divorce from his wife and legally marry her. She went to the apartment occupied by the woman the defendant was then seeing again and found him there. Again, she had a conversation with him about getting an annulment. On that occasion he said "If you take me to court, I will kill you."

From that point on, the plaintiff testified that she began receiving telephone calls from Dr. Holcombe and from his lady friend all hours of the night. She also received anonymous calls.

There was other evidence to the effect that, after Dr. Holcombe threatened the plaintiff the first time, she moved to another apartment and got an unlisted telephone number. For a period of time the calls from Dr. Holcombe and his friend stopped. Then her apartment was broken into and some of her clothes were soaked with what later appeared to be iodine. Thereafter, the calls resumed. After the break-in, she had new locks put on the door and the windows were nailed closed.

She also had friends spend the night with her thereafter.

The plaintiff filed the instant suit in September, 1971. In October of that year, Dr. Holcombe went to her apartment. When she refused to let him in, he began to beat on the door, tried to get in, and again said "If you take me to court, I will kill you."

The complaint charges the defendant with fraud and misrepresentation in that he had fraudulently misrepresented to the plaintiff that he was unmarried and that, relying on such misrepresentation, she married him. The averments are that as a proximate consequence of the fraud, the plaintiff was injured and damaged as follows: "She suffered grievous mental anguish and humiliation, her nervous system and emotional system was permanently injured . . ." A second count claimed damages for assault.

Although the defendant assigns some sixty-odd grounds for reversal, he argues the following issues only:

The court should have granted his motion for a directed verdict on the fraud count, because he contends the plaintiff failed to offer any evidence that she had suffered any damage. It is the defendant's contention that proof of actual damage was necessary to the plaintiff's cause of action; that the plaintiff failed to prove such damage; and thus the fraud count should not have been submitted to the jury.

While this is the first case to come before this court seeking damages for fraudulently inducing one into an illegal or void marriage, we have long recognized, as actionable, misrepresentations made with intent to deceive, relied on by and resulting in damages to the injured party. Thus, we have no hesitancy in joining a number of states in expressly holding that when one wrongfully induces another into a marriage, by misrepresenting or concealing facts which render the marriage

**434**

void, the person so deceived is entitled to an action for damages. *Morris v. Mac-Nab*, 25 N.J. 271, 135 A.2d 657 (1957), the subject of an annotation found in 72 A.L. R.2d 956. See also Restatement of the Law of Torts, Vol. III, § 555 (1938). The defendant, however, argues that no recovery in such a case can be had for mental suffering alone but, in addition, there must be damages to the person, reputation or estate. In answering that same contention made by the defendant in *Morris v. Mac-Nab*, supra, the Supreme Court of New Jersey said:

> ". . . we reject the defendant's first point and come now to his second point in which he contends that the plaintiff's first count, which sought recovery for shame, humiliation, and mental anguish, should have been dismissed by the trial court. The defendant cites authorities which indicate that, absent physical injuries, damages for shame, humiliation, and mental anguish are not recoverable where the actor is simply negligent. See *Prosser, supra* [Torts, 2d Ed. 1955], at p. 180; 2 *Harper & James, Torts,* 1031 (1956). But the authorities all recognize that where the wrong is willful rather than negligent, recovery may be had for the ordinary, natural, and proximate consequences though they consist of shame, humiliation, and mental anguish. . . . *Prosser, supra,* at p. 38. Here the defendant's conduct was not merely negligent, but was willfully and maliciously wrongful. It was bound to result in shame, humiliation, and mental anguish for the plaintiff, and when such result did ensue the plaintiff became entitled not only to compensatory but also to punitive damages. . . ." (25 N.J. at 280, 135 A.2d at 662)

We agree with this statement and find it consistent with the law in Alabama. See *Alabama Great Southern R. Co. v. Sellers,* 93 Ala. 9, 9 So. 375 (1890).

■ The defendant also argues in connection with the issue of damage that the trial court erred in refusing evidence that, prior to this marriage, the plaintiff suffered from veneral disease, had an abortion, and had affairs with many other men. Of course, the defendant must face the general rule that prohibits evidence of general character as primary evidence. See, e. g., *Phillips v. Ashworth,* 220 Ala. 237, 124 So. 519 (1929). Yet, the defendant cites us to an exception to this rule, that is, if character or reputation becomes a matter in issue, evidence with reference to such a party's reputation or character is admissible. While this is a correct statement of the law, we do not find that the plaintiff's character was placed in issue in this case. She did not sue the defendant for fraudulently inducing her to have sexual relations with him; she sued him for fraudulently inducing her to enter into a void marriage with him. In *Lester v. Gay,* 217 Ala. 585, 587, 117 So. 211, 213 (1928), which, unlike this case, involved a claim by the plaintiff against the defendant doctor for an alleged indecent assault, we said:

> ". . . the reputation of the female plaintiff for chastity cannot be put in issue by the defendant, nor can specific acts of impropriety be shown in mitigation . . . ."

The plaintiff's reputation or character was not in issue here; nor did she open the door for the defendant to attack her character. Therefore, such evidence was properly excluded.

■ The defendant next argues that the court erred in refusing to give a requested charge which sought to instruct the jury that intent to deceive was a necessary element in the plaintiff's cause of action. There was no error in refusing this charge, since the trial court adequately instructed the jury in its oral charge on this issue. In its charge to the jury, the court said:

> "Now, of course, a fraud and a thing of that sort has to do with knowingly saying something that is untrue. . . .

" . . . But if he knew he was married, and if he intentionally told her that in order to do something or the other that she would not otherwise do, and did induce her to do that, that would be what we would call fraud . . .

" . . .

"And I will say this with reference to Count Number One, which deals with that sort of thing, that if she, from any source, knew before she married him that he was married and not divorced, if she knew that, then, of course . . . she could not recover from him. . . ."

There is no error to reverse on this ground. *Boise Cascade Corp. v. Lee*, 291 Ala. 666, 286 So.2d 836 (1973).

The next issue argued by defendant concerns the assault count. The plaintiff claimed that the defendant committed an assault when in June of 1971, she went to see him and tried to get him to get an annulment, he said "If you take me to court, I will kill you."; and again in October, 1971, after she had filed the instant suit on September 29, 1971, when he went to her apartment and beat on the door, tried to pry it open, and said again, "If you take me to court, I will kill you." (The complaint was amended to include this act.) The defendant claims this in no way can constitute an assault, because it was merely a conditional threat of violence and because no overt act was involved. In order to safeguard freedom from apprehension of harm or offensive conduct, the law provides an individual with a remedy at law. See Prosser, Law of Torts, page 37 (4th Ed. 1971).

An assault consists of " . . . an intentional, unlawful, offer to touch the person of another in a rude or angry manner under such circumstances as to create in the mind of the party alleging the assault a well-founded fear of an imminent battery, coupled with the apparent present ability to effectuate the attempt, if not prevented."

*Western Union Telegraph Co. v. Hill*, 25 Ala.App. 540, 542, 150 So. 709, 710 (1933).

While words standing alone cannot constitute an assault, they may give meaning to an act and both, taken together, may constitute an assault. Prosser, supra (2nd Ed. 1955). In addition, words may negative an act in a manner that apprehension in such a case would be unreasonable. "On the other hand, a show of force accompanied by an unlawful or unjustifiable demand, compliance with which will avert the threatened battery, is an assault." 1 Harper & James, The Law of Torts, page 223 (1956). " . . . the defendant is not free to compel the plaintiff to buy his safety by compliance with a condition which there is no legal right to impose." Prosser, supra, page 40 (4th Ed. 1971). It is obvious that the defendant in the instant case had no right to impose the condition he did on the plaintiff; and we cannot say that this condition explained away his threat to harm her.

The defendant says his conduct cannot constitute an assault because there was no overt action taken by him. The evidence from the plaintiff was that the defendant was pounding on her door making every effort to get into the apartment, and threatening to kill her if she persisted in "taking him to court." We cannot say, as a matter of law, that this was not sufficient to arouse an apprehension of harm or offensive conduct. We think it was a jury question, as was the question of whether the defendant had the apparent ability to effectuate the threatened act.

The defendant next complains that the trial court erred in allowing evidence of various events from the time of the break between the plaintiff and defendant. The plaintiff was allowed to testify that, from the time she was threatened by Dr. Holcombe the first time and continuing for several months, she received frequent anonymous calls late at night, that the caller only made breathing sounds, and that

sometimes the caller would simply hang up when she answered the telephone. She moved to another apartment and got an unlisted telephone number. The calls stopped until her apartment was broken into, at which time iodine was poured over her clothes. Thereafter the calls resumed.

■ The fact that the calls were made was admitted into evidence, not the content of such calls. Generally, in order to introduce evidence of a telephone conversation, the identity of the alleged speaker must be satisfactorily established. *Dentman v. State,* 267 Ala. 123, 99 So.2d 50 (1957). If, however, it is the fact that a call was made that is introduced, the test is one of relevancy, i. e., is it material to some issue in the case. See generally Annot. 13 A.L. R.2d 1409.

■ Under the circumstances of this case, we cannot reverse the trial judge for allowing this testimony. When Dr. Holcombe left the home of the plaintiff and returned to his former "girl friend," the plaintiff protested. It was her testimony, and apparently the jury believed it, that she thought he was her husband. When she objected, his answer was that he was already married. When she then beseeched him to either get a divorce and marry her legally or get their marriage annulled, she claims he said he was not going to do either, and that if she attempted to do anything about it he would kill her. From then on, the jury could have found that Dr. Holcombe and the lady with whom he was then living began a program of harrassment, intimidation, and threats, which could have been construed to kindle fear in the plaintiff and to achieve what apparently the doctor wanted—to keep her from doing anything about the void marriage, which he, according to the jury's verdict, had lured her into. According to the testimony offered on behalf of the plaintiff, the doctor succeeded in his efforts to frighten the plaintiff. She was fearful enough to ask friends to stay with her at night; never left the apartment alone after the threats on her life; had her brother-in-law nail the windows closed after the break-in of her apartment; and told one of her friends that she was afraid there might be poison in her coffee. We believe this testimony was relevant under the circumstances of this case. The defendant threatened to kill the plaintiff if she did something she had a legal right to do. We think the evidence of what occurred subsequent to his threats and emanating from them was relevant to the issues being tried.

We find no error to reverse, and turn now to the plaintiff's cross-appeal.

■ She complains of the trial court's condition of remittitur for the overruling of the defendant's motion for new trial. There is no question that the trial judge cannot substitute his own judgment for that of the jury in determining whether to order a remittitur. *Central of Georgia Ry. Co. v. Steed,* 287 Ala. 64, 248 So.2d 110 (1971). To permit such a procedure would deny the parties their right to a jury trial. In addition, " . . . the authority vested in the courts to disturb the verdict of the jury on the ground of excessive damages is one which should be exercised with great caution . . . " *Airheart v. Green,* 267 Ala. 689, 693, 104 So.2d 687, 690 (1958). Yet this court has recognized that where the trial court has ordered a remittitur and refused to grant a new trial, a favorable presumption of correctness of that action is accorded. *Birmingham Electric Co. v. Thompson,* 251 Ala. 465, 37 So.2d 633 (1948); *Southern Cement Co. v. Patterson,* 271 Ala. 128, 122 So.2d 386 (1960). Moreover, "Remittiturs are favored in proper cases for the promotion of justice and the ending of litigation." *Southern Cement Co. v. Patterson,* supra, at page 135, 122 So.2d at page 392. In reviewing such action, this court must be aware that the trial court was in a position to observe all of the witnesses who testified and other incidents which are not re-

flected in the transcript. We do not find error in this action. *Airheart v. Green,* supra.

The judgment appealed from is, therefore, affirmed.

Affirmed.

HEFLIN, C. J., and MERRILL, MADDOX and JONES, JJ., concur.